Good morning, may it please the Court, my name is Andrew Goldsmith and I represent Florence, Kentucky. I'll begin today with the Speedy Trial Act. The text of the Act, the Supreme Court's decision in Zedner, and this Court's decisions in Bryant and Sanders, all require the District Court to explain, on the record, its reasons for finding that the ends of justice served by the granting of an H-7A continuance outweigh the best interests of the public and the defendant in a speedy trial. And given that the Supreme Court has said we can look at the District Court's opinion in denying the motion for a speedy trial, how could we find that the District Court did not make adequate findings here? Because in this Court, Your Honor, in denying the motion to dismiss, the District Court did not add to its original findings. The District Court recited its original findings. Had the District Court, in denying the motion to dismiss, added to its findings and said that the interests outweighed the interests of the public? No, she said it. She said it initially. She talked about the interests of the public, and then in denying the motion for a speedy trial, she referred to it several times again, the interests of the public. Your Honor, in the beginning of her decisions, she recited that as the standard. And then in describing the findings, the factual findings that she's required to make, she described her previous findings. She did not make any additional fact findings. What more should she have said, just so I'm clear, about the interests of the public? Sure, Your Honor. She should have addressed the interests of the public in some way. Like saying what? She could have addressed it using that phrase explicitly, but I don't think that's required. In the Rice case, for example, which the government relies on, the District Court referred generally to the need to get cases to trial as quickly as possible. I think that's a fair reference to the interests of the public. The District Court here said everybody's moving as expeditiously as possible to get, you know, the discovery done and the investigation done, and getting the defense counsel an opportunity to review what they discovered. Those are references, Your Honor, to the interests of the government in this particular case and the interests of the defendant in this particular case. Mr. Goldstein, she did. The District Court did refer to – the District Court did say – the District Court talked about what would best conserve judicial resources and what would most efficiently use the time of the jury. Aren't those public interest factors? Your Honor, I think the District Court referred to the interests of justice, which is part of the test that's required by the statute. But she did not weigh the interests of justice, the benefits to the interests of justice, against the interests of the public and the interests of the defendant. So if she had done what you think she should have done, which is hypothetical, what would she have found? Your Honor, there are four orders that we challenge. No, I know, but I want to know the sentence that is missing here in your view, the two sentences. Hypothetically, Your Honor, and I don't know that they would have been supported in this case, but the sentences would have been along the lines of, I've considered the interests of the public in a speedy trial in this case, and given the facts and circumstances of this case, the interests of the public outweigh the interest in a speedy trial. And the court in Zedner and this court in this case have talked about some of the interests of the public apart from the interests of the government and of a defendant in a particular case in proceeding with speedy trials. Just the last point I would make on this, Your Honor, is that this court in the Lopez Sierra Gutierrez case, which the government also cited, in that case the defendant argued that the district court's stated reasons on the record were not its real reasons for granting continuances. This court rejected that argument, and it said we take the district court at its word. We're asking for the same thing here. Taking the district court at its word, it did not do the balancing test that is required. Moving to the speedy trial Sixth Amendment argument, I want to focus for today on the fourth Barker factor, which is prejudice. Ms. Bukundi was incarcerated for 20 months before her trial, severely limiting her ability to confer with counsel. In this case, a very document-heavy case. There were thousands of documents involved in a relatively long time period for a criminal case. The government, meanwhile, benefited greatly from the delay. The government talks in its brief at page 22 about how it waited until the day it arrested my client to issue subpoenas to banks, and then it took more than six months, not surprisingly, to process those subpoenas. There was no reason to wait that long. Unlike other people and entities, banks are prohibited by statute from disclosing grand jury subpoenas that they receive. Issuing those subpoenas earlier would not have endangered this investigation. That should have been done earlier. Similarly, the government arrested my client the day after it searched Global's offices, after collecting thousands of documents. There's no reason it couldn't have begun the processing of those documents, reviewed those documents, before arresting my client. That would have preserved her ability to have a speedy trial. And, of course, the government eventually, months after it told the district court it would do so, superseded the indictment, adding a number of defendants, most of whom ended up being witnesses against my client. And, finally, during the trial, after the 20-month delay, the government created and disclosed for the first time Exhibit 439, which my colleague Mr. Kirsch will address, which was of great prejudice to both defendants. Ms. Bukundi moved for bail repeatedly, which courts have recognized preserves the same interests or some of the same interests as a speedy trial. The district court here said that it was concerned about the time that discovery might take, given the nature of the case. She said that that circumstance called for, quote, unrelenting efforts by the government to process discovery and get ready for trial as promptly as possible, close quote. That was in response to my client's first motion for bail. The government did not heed the district court's warning. And that language comes from docket entry number 24 in the district court. Moving on to the money laundering substantive counts, concealment counts, all of those transactions that issued in those accounts moved money from a global account where the defendants were the only signatories, either directly or with respect to one of the counts indirectly, to another account where the defendants were the only signatories. Those transactions could not have been intended to conceal anything because the accounts were openly controlled. So the FBI informant testified otherwise, right? He said when you have sham companies using money orders and rapid and repeated transfers, that that creates an inference that you're trying to hide. There's no requirement in the case law that it would be a perfect effort to hide, right? That's true, Your Honor, but I think the requirement is that there actually be evidence of an intent to hide. I'm not arguing that... But there are inferences here, right? Yes, Your Honor. I don't think that the fact of the transactions alone is sufficient. This court, I understand that that's what the agent said. This court said in the law... No, but it's the three together. It's sham companies, money orders, rapid repeated transfers. You don't just have one. Why couldn't a reasonable juror look at that and say, you know, they're trying to hide something here? First of all, Your Honor, the fact... That's not crazy. That's not crazy to think that. I think that that evidence is not sufficient, Your Honor. I'm sorry. Finish your answer, sir. Thank you, Your Honor. The other companies through which some of the money traveled, to the extent those companies did not do other business, that helps the defendants, not the government. The idea, the classic money laundering case that this court has recognized, and that of the Hinty case, is moving money from an illicit business into a legitimate business. What's the role of the cashier's check? What's one use of cash? Well, the one fact in the record, Your Honor, was that there was apparently fraud within the global accounts, fraud against global, against the defendants. The agent testified about that fact. And so that gives the defendants a perfectly good reason to want to move money out of accounts, to not rely on ordinary checks, to take cashier's checks. There was in the record testimony that four checks that the agent found, global checks, bounced. In order to avoid that, the defendants may have wanted to use cashier's checks. And those are all reasonable inferences. But isn't it also a reasonable inference that when you put these three things together, it looks fishy? It looks like somebody's concealing something. And that's all we need to find, right, on appeal. That's the nature of the inquiry for us. I don't think so, Your Honor, for two reasons. One is that this court said in law that in money laundering prosecutions in particular, the government is obliged to overcome innocent explanations for the conduct because of the fine line between criminal and non-criminal conduct here. Secondly, the court has also talked more than once about the fact that where the evidence is equivocal or where there's an equally plausible innocent explanation and guilty explanation, that that's not sufficient. Because in those circumstances, the only way to find guilt is to speculate, to choose one versus the other when the evidence is in equal poise. And that's in the Davis and Wilson cases that we cited in our briefs. Isn't the allegation here, the allegation isn't that the defendants were trying to conceal their connection to the money. They were trying to make clear that this wasn't Medicaid money. They were trying to disconnect the money from Medicaid. So even though all the accounts were in their names and it was all transparent, their purpose was to launder the money and why couldn't the jury have easily concluded that from this? The money went into Global's account, immediately went out to these two corporations that, you know, one was allegedly a real estate corporation and the other was international trade or something. The whole purpose of this was to cleanse it of any connection to Medicaid funds. And the jury could quite easily conclude that from this, couldn't it? Well, Your Honor, I think that raises this issue of the sham companies and whether these other companies did business or not. The government argued that they didn't. And if they didn't, then that's not... But you agree with me that that's the question we have to look at, right? Their intent, the intent was, the intent to launder the money so there was no connection to Medicaid, to make it look like the money came from other sources. That's the intent. Not that they wanted to conceal their connection to the money. I don't... Is that what that's all about? I don't think that that can be inferred here, Your Honor. As the government says, Global did virtually no business other than DC Medicaid. The government alleged that these other businesses... Right, and up to that point, you know, it's clearly a Medicaid connection. It's the next two companies. Well, Your Honor, I think I would also again point to the Addafahinty case. Which case? Addafahinty, which we discussed in our briefs. Right, yes. In that case, the defendants moved money into a corporate account, into personal accounts, and into cash. And this court said that those circumstances were not enough in reverse of convictions. Because the accounts, including the corporate account, were all obviously... But we have more here than Addafahinty, right? Well, we have this... We've got the sham, we've got the cashier's checks, we've got the repeated rapid transfers. We don't just have those bare facts. We've got more here. For the reasons I've said, Your Honor, I don't think that those add to the facts. I think those are all easily explainable facts. There are other money laundering cases where defendants tamper with records. You could easily imagine a money laundering case where there was some actual direct evidence of people talking about money laundering. There were numerous cooperating witnesses in this case who testified about the defendants. None of them said anything about laundering money or hiding proceeds. You know, the other difference, I'm just looking back at that, how do you pronounce this? What is it, this case? I think it's Addafahinty, Your Honor, but I'm not certain. Okay. It's harder to pronounce than it is to understand. So you're right. In that case, there were fake entities just like here. The fake entities there had a connection to the illegal real estate scheme. Here, these two companies, if you just look at these two companies, you know, their articles of incorporation or whatever, you would think the money here came from either real estate or some sort of international trade deal. It had nothing to do with Medicaid. But that's the difference between this case and that unpronounceable case. I think none of those companies, as the government argued, in fact, didn't do any other business. Just based on the name of the company alone, it was also apparent that they were the defendants' companies. I think the one other case that I want to bring to the Court's attention on this is the Stoddard case, which we wrote a 28-J letter to the Court about, where I think the evidence was much stronger of an intent to conceal, and the Court reversed the convictions. This was a case where the defendant was effectively a straw purchaser for a car. He bought a car that was to be used by his friend, who was a drug dealer. The defendant bought it in his own name, even though it was to be used by his friend. He paid for the car with drug money that his friend put into his account for that purpose. And this Court said that that wasn't sufficient. The reason it wasn't sufficient was that the defendant and the drug dealer went to the dealership together to set up the purchase of this car. Similarly here, all of these accounts are tied directly and obviously to the defendants. Did the evidence also show it wasn't simply putting the money into the three global accounts, as Judge Griffith has recounted, but there were hundreds of accounts? There were a large number of accounts, Your Honor. I think one explanation for that could be the large amount of business that this company was doing. There's no dispute that Medicaid paid the company $80 million over several years. It had up to 800 or more than 800 clients at certain points. It was a large company. People could have perfectly reasonably wanted to spread their money among multiple banks, multiple accounts, just as a matter of protecting the money. Not that if you think that through, really, that that necessarily makes sense, but that's a perfectly rational thing, I think, for an ordinary person, which is really what we're dealing with here, an ordinary person to try to do to protect themselves. So I know that's the way you started your brief. And how much evidence was before the jury about the defendants, or particularly your clients, other operations, business operations? Other operations besides Global, Your Honor? Yes. There was a little bit of evidence regarding a previous company called Flow Diamond, which was also a health care company that Ms. Bukundi, my client, operated before Global. Right. That's in the same area, right? I was in Maryland, Your Honor, as opposed to Global. No, I mean... I believe it provided... In other words, I thought your brief, when it opened, was trying to paint a picture of almost a multi-corporate operation here, as opposed to, you know, I know $80 million is a ton of government money, but still a relatively confined operation. But I didn't see any follow-through on that. So to the extent, for the three reasons that Griffith mentioned, plus the fact there were hundreds of accounts, I mean, I might see that with General Motors, but I didn't see the facts here for that. Well, Your Honor, I think the evidence was clear in the record and came up more than once, that there were more than 800 clients with Global by the end of its time. That it employed... Global, that's my point. That's Global, yes, Your Honor. Yes. And that it employed or contracted with some 700 home health aides. It was a very large company. It was. It was not General Motors, certainly. No, no, but it's one, and then the jury heard about this other operation that she had, and that's it. That's correct, Your Honor. All right. I just want to be clear. I'm probably well over my time. I can address the other issues, but I would like to save some time for rebuttal. Good. All right. Thank you. You're welcome. Good morning, Your Honors. May it please the Court, Katherine Kelly on behalf of the United States. Good morning. I just wanted to clarify one thing with counsel. I'm sorry. Counsel, you want to save your time, but you intend or do you intend to make the arguments that you listed regarding the sentencing? I can, Your Honor, briefly in four or five minutes talk about the money laundering and the sentencing issues. Well, all I'm getting at is the nature of rebuttal versus presenting your argument. I know our questions have taken up some time, so do you want to make it clear what you want to emphasize about your sentencing objections? Sure, Your Honor. And I would confine rebuttal to responding to what the government says. With respect to restitution, Your Honor, the MVRA says very clearly that the burden of demonstrating the amount of loss sustained by a victim as a result of the offense shall be on the attorney for the government. This Court, in fair, said that that sentence means what it says. The government here tries to escape that sentence by saying that because it's the defendant's fault that it was impossible to figure out how much of the billing was legitimate versus fraudulent, the defendant should bear the burden. But there's a sentence in fair that seems to open the door, though, doesn't it, for a court to shift the burden and to place the obligation on the perpetrator, the alleged perpetrator, if that perpetrator is in a better position to know what was legitimate and what was not? How should we think about that language in fair? I'm with you on the language of the statute. I'm not talking about that sentence not fair. Yes, Your Honor. I think that the burden shifting that's talked about here and in other sentencing contexts typically is a burden of production, not a burden of proof or burden of persuasion. That remains with the government. And here, I would say the defendants met the burden of production because the evidence was full of, or the record was full of evidence that there was legitimate billing. All of the government's witnesses, cooperating witnesses, testified to that fact. The aides said that they provided legitimate services to legitimate clients. So if there's a burden shifting... But weren't the defendants in the best positions to prove the value of those services? How could the government disprove it? Your Honor, the government did bring a certain number of witnesses who testified about, cooperating witnesses who testified about services they provided or did not provide. They brought a certain number of clients who testified about services they received or did not receive. The government could have attempted a quantification of what it could actually prove. It didn't do that. It brought a handful of witnesses, again, keeping in mind that there were 700-some aides, 800-some clients. It brought 10 employees, 5 aides. And they testified to what they testified to. And if the government wants to be content with that, then it can be. But it has asserted that it can make much broader generalizations that just aren't supported by the record. If we were to disagree with you and to affirm the district court on the sufficiency of the evidence, but then we were talking about restitution, if we went in your direction and vacated the restitution order, doesn't that give quite a windfall to the Bukundis who, if we affirm that they committed this fraud? Well, I guess the question, Your Honor, is what the fraud is. The court might affirm the conviction. The conspiracy count, for example, of course, is very broad and could be supported by a relatively small conspiracy or a relatively large conspiracy. But then when we get to restitution, when we get to compensating the government as the victim, in this case the government, the D.C. Medicaid as the victim, the government, the U.S. Attorney's Office, has to prove the extent to which it actually was a victim. That's what statute says. That's what FAIR says. The government hasn't done that. The government has asserted that the fraud was very widespread, but conceded that it was not complete, that there was legitimate business going on, legitimate services being provided. The district court found that, that there were legitimate services being provided, and it found that it couldn't identify the scope of those services. That's at page 1830 of the joint appendix. Those two findings say that the government has not proven and cannot prove the scope of any overbilling fraud here. It can't do it. So the district court also found, did it not, that the fraud was so pervasive that the alterations were made not only to patient records, billing records, employee records, so that the implication of that finding, although I realize one circuit has rejected it, was that it was an impossible task and therefore at least, piggybacking on Judge Tatel's question, a burden on the defendant to proper come forward, not bear the burden of proof, but simply proffer that either there was a way or there were records, sort of an accountant who keeps a double book. Now, there may not have been double books here, but was there any pressure on the government to indicate what it had tried to do to calculate what legitimate services were provided? To my knowledge, Your Honor, the government made no attempt in that direction. And did the defense press the district court on that? The defense argued, Your Honor, that the government had not proven that the size of the offense was the $80 million, the full amount paid by Medicaid, and that's hardly disputed. The government didn't say that all of that was fraud. It said that it couldn't figure out what was fraud and what wasn't. And I think in that respect, I would point the court to the Ninth Circuit's decision in Rutt-Gard. Yeah, that's the one I referred to. In that case, the district court said that the defendant's business was permeated with fraud. And the Ninth Circuit accepted that characterization and said it wasn't enough, either for conviction or for sentencing, that that wasn't enough. The government has to prove in the context of restitution where it is saying that the D.C. Medicaid is a victim, it has to prove the extent to which it is a victim. In forfeiture, where the government wants to claw back ill-gotten gains by the defendants, the government has to prove the extent of those ill-gotten gains. It has to prove that they were actually gained by the defendants. And if it doesn't prove that, then it can't take that money. And it applies as well to loss. It works a little differently on loss calculation, though, doesn't it? I mean, as I understand it, the government makes that the prima facie case by submitting the receipts. So we start here, we have $80 million in tainted receipts. Not quite, Your Honor. I think that application note says that the amount of the fraudulent bills, that's the language in the note, fraudulent bills, that that's a prima facie showing of intended loss. But my point here is that the government hasn't proved it. Didn't tell us which is fraudulent and which is not. Correct. Would you speak to what note 3E does in our loss calculation? Yes. So 3E1 says that the defendants are entitled to a reduction of any loss calculation for the fair market value of the services rendered. That's the pieces of the language that would apply here. And I think they do apply here. There's plenty of evidence that there were services rendered. And the governments are entitled. First, the government has to prove an amount of loss, which it hasn't done. But even if it did do that, that amount would have to be reduced by the services rendered. And the government in its brief characterizes that note as having to do with legitimate services rendered. The note doesn't say that. The word legitimate is not there. For a perfectly good reason, this is a criminal sentencing statute. It's assumed that there's some amount of illegitimacy. That's why we're here. But the point is if actual services are provided. If we were to remand on that, what would it look like at the district court? Well, Your Honor, I think the district court, as I mentioned, has already found that it is impossible to determine the amount of loss. So I would not concede that on remand the district court can take that back and give the government another chance. How about in a hypothetical case? What does it look like? Who has the burden? If you go back to engage in a 3E inquiry, who has the burden? Well, I think first, Your Honor, the government has to make out a loss number. Right. In my hypothetical, let's imagine that's done. But now we're having a 3E hearing if there is such a thing. What does that look like? Well, I think that the court has to determine the value of services rendered. And I think I would go back to what we talked about earlier about the burden of production and persuasion. The defendant here can point to the extensive evidence in the record that there were services rendered. And then I think it remains that the final burden remains with the government to prove whatever number it wants to attach. What I'm getting, people are trying to struggle with this a little bit, in terms of in a normal paper trail, the government would just review the records. You're positing a situation almost as though, hypothetically, let's assume the records are destroyed in terms of their value to the government in trying to estimate the legitimate services. So the government is left with the obligation to, A, interview anybody they can identify. But at a minimum, since they proffered these defendants as witnesses of their own, they had to acknowledge that to the extent they proffered evidence that there were legitimate services, at least that amount has to be credited. Whatever it is, $100, $200, $2,000. So it just can't be that the $80 million is the beginning and the end. Now, the note talks about the bills. And here, the district court focused not on the bills but on the actual amount seen. Does that sort of solve some of the problems? I don't think so, Your Honor. The number, and I will be frank, that the number that we're talking about here is the number that was received by Global. It was not the amount that was billed by Global, which is somewhat higher. But I think still the government needs to show that the bills that led to those payments were fraudulent, and that's what it hasn't done, either with respect to the overbilling or with respect, I'd add, to the exclusion fraud that's alleged against my client. There are two points I want to make on that. First, there was never any allegation that Mr. Bakundi knew about the exclusion fraud, had anything to do with the exclusion fraud. So that can't be a basis for any sentencing of Mr. Bakundi. As to Ms. Bakundi, my client, I'd point to a number of cases that we cited in the briefs, from the Third, Fourth, Fifth, and Seventh Circuits, that all held that fraud in obtaining a contract does not paint all the money that is later paid as a result of the contract. And so similarly here. Well, but not necessarily. Well, fair enough, Your Honor. And I think these facts match quite well the facts in those cases. Those were all cases where defendants misrepresented their qualifications for whatever contract it was. There were minority-owned business programs, et cetera. None of those were health care fraud cases, right? That's correct, Your Honor. But to the extent that the government wants to take this idea that Global's application for a provider number taints everything that went after, I think those cases are all great analogies. Those are criminal cases where people improperly obtained contracts, and that's one thing. But then what they got paid through those contracts for actual work that was actually done is something else, and one does not taint the other. All right. So I want to ask you, you raised on the forefront, you talked about the ability to pay. Did you raise that below? Your Honor, I'm not certain whether that was. It's the excessive fines argument, right? Yes. Well, the excessive fines argument was certainly raised. Was raised below? Yes, it was, Your Honor. The defendants argued extensively that it violated the excessive fines clause. Because it restricted the ability? Because they didn't have the ability to pay? Was that the argument? I'm not sure that that argument in particular was made. Was the argument made that the implication was sentencing to a life of debt, indebtedness? Well, Your Honor, I think that the district court found with respect to Ms. Bukundi that he didn't have the ability to pay a fine. I don't think it explicitly found that as to Ms. Bukundi, but it did not impose a fine on her. The point I was getting at is I don't think you raised the ability to pay argument until here. And so then I was going to ask, so that's plain error. How, given the precedent? That's fair, Your Honor. And I don't think that the – I don't think that that point is a necessary point to the argument. On the excessive fines point, Your Honor, the two points that I would make are that under Bajaka-Gion, there are two issues. Whether the fine is punitive and whether it is grossly disproportional to the offense. I think in this case it is both. It is punitive because, as we've discussed, the government hasn't proven the amount of any loss. And any amount beyond any amount of loss is punitive. It's grossly disproportional for effectively the same reason. In order to figure out if it's proportional, you'd have to look at the scope of the offense. The government hasn't proven the scope of the offense. Thank you. Let's hear from the government. Good morning, Your Honor. May it please the Court, Catherine Kelly again for the United States. If Your Honor would like, I'll start with the Speedy Trial Act issue. There's no need for the district court here to add anything to the findings that she made in regard to why the time was properly excluded from the Speedy Trial Clock. As this Court stated in Rice, the findings under 3161H7 do not call for any magic words. When the Court ultimately denied the dismissal motion in July of 2015, the Court stated the full standard, weighing the interest of justice for all the periods involved at issue in the hearing, recited the full legal standard, and then denied the motion. And it therefore applies to all the periods at issue. In the finding at the dismissal motion stage, in making the rulings at the time, the Court also included her reasons on the record. There is no requirement that... There's no magic words requirement, but simply reciting the standard is inadequate, right? The cases tell us we need to see that the district court judge grappled with the facts. That's correct, absolutely. So where do you see her grappling? We see her grappling with that when she's doing the hearings where the parties are explaining how much discovery is being turned over, how many voluminous documents they've received, and how they're processing those, reviewing them, scanning them, having them put on searchable databases for the defense, and so forth. And in this case, that sort of finding and that sort of discussion shows that the Court was weighing all the necessary interests. In particular, in the right, in the Lopez-Sierra Gutierrez case, the Court found the findings by the district court sufficient, even though in neither of those cases did the district court mention the public's interests specifically. In those cases, the Court had considered the complexity of the case as one of their considerations in both, the interests of the defendant and so forth, and that's exactly what happened here. The Lopez-Sierra case talked about the ample discovery that was going on and so forth. So those are the same considerations that the district court was weighing in this case and explained on the record. And in that regard, and I believe it was the Rice case also that said, in addition to not the magic word, that sometimes when you actually look at what is the Court examining, that's more important than seeing this, it just wrote recitation of the standard under 31H7. Now, Ms. McCombie makes the argument that her speedy trial right was violated for various reasons, and I know the government disputes that, but hypothetically, if her speedy trial right and the government's obligation to bring her to trial within 70 days plus any proper exclusions, then her right was violated. You get where I'm going in this. I'm saying it all at once, but my point is her 70 days plus valid exclusions, she argued, expired before a superseding indictment was filed. And the argument sort of is that, well, you file a superseding indictment, you add defendants, and the clock starts again. I didn't see any case, though, that really deals with this factual situation. Had you come along for any such case? That is where the originally indicted defendant's time expires, but they're held over because the government is contemplating a superseding indictment. We did not find, in doing our research for the case, any case that squarely addressed this point either. The closest that I was able to find was the Chen Chang Liu case from the Ninth Circuit, where there was an obviously very old indictment in California that seemed to cover the same conspiracy that was later indicted in Nevada. And given the very long time between those two indictments, it would appear that the original speedy trial clock would have run on a California case. So it's your understanding of the law, though, that in a hypothetical case, the initially indicted defendant's speedy trial right expires at day 71, in my hypothetical, and the government must dismiss the indictment? Well, the government, if there was an improper, if there was a violation of the Speedy Trial Act, then the dismissal, as Zedner says, dismissal either with or without prejudice. That's what I'm getting at. So, it can be a dismissal without prejudice? Correct. And that's up to the district court to decide. And what was unusual about this case is that it wasn't until about six months after the superseding indictment was filed in this case that this could be moved for dismissal under the Speedy Trial Act and complained then about periods only in regard to the time on the original indictment, which put the district court in a very difficult position because it, there was at no time was the district court faced with the old indictment and making a decision in a timely manner on whether or not to dismiss with or without prejudice. So it was a very unusual situation in that regard. And as the court, the court in ruling on that motion to dismiss, first of all, this clearly explained what her rationale was, explained what her, the legal standards were, and then denied the motion to dismiss. So, when the issue really is here, whether or not sufficient findings were made under H-7, based on that ruling, plus all the rulings that the court made in excluding the time as they were coming up in the first place, we believe that sufficient language was placed in the record. And, therefore, there was no speedy trial violation at all. I'll save my questions for that case. Thank you. Thank you. In regard to the Sixth Amendment speedy trial issue, just briefly, on the fourth prong, the defense in its briefing of the issue did not say that there was specific prejudice to Mrs. Bikundi's defenses. It's not in the briefing that Mrs. Bikundi was having difficulty, for instance, conferring with her client, as was argued here today. In the briefing, they simply referred back to a presumptive prejudice under the first prong, saying, since this was a delay of over a year, we don't need to stay anymore. There's nothing in the record that I'm aware of where Mrs. Bikundi's attorney was ever saying that there was any difficulty communicating with his client. Did she know physically where she was held? I believe she was in the D.C. jail during that time. She was present for numerous status hearings and so forth. That's my impression from the record, Your Honor. In regard to the money laundering convictions, as was pointed out in our brief, it's unnecessary to hide the relationship between Mr. and Mrs. Bikundi and the bank accounts and the corporations. But what makes this case different is they're disguising, they're attempting to disguise, the source of the funds, that this money came from D.C. Medicaid. And it's a series of things that make this a valid case to show that they did, in fact, have an intent to hide the source. Each of the transactions that was charged, they're running D.C. Medicaid money in the course of one to four days at the outset through the global account that takes in the money, through a second global account, in one instance through another FlowDiamond account. And then, during that one to four days, that money is then going either to CFC's accounts or TriContinental's accounts, both of which were sham companies, as the record showed at trial. They did no business in the case of TriContinental, and they certainly did no business at all with Global, had no contracts with them and so forth. The Thayer case and the Bolden case that we cited in our briefs are both situations where money transferred through sham corporations was indicative of money laundering and supported that finding. In addition to that, the money then went into numerous accounts, mainly held in personal accounts by the Bukundis, and they used, in a number of instances, cashier's checks to transfer money from accounts that they owned into other accounts that they owned, which, as Agent Henson testified, was very unusual, given that they could have done it in a traceable manner very easily. As far as their innocent explanation that they come up with now, saying there was some sort of fraud on the Global account, Agent Henson investigated that during her investigation in unwinding all these transactions and testified that she interviewed numerous witnesses about some potential of fraud on Global's accounts, and no one was ever able to tell her anything more about it. No one ever had any additional information, as stated at Joint Appendix, page 1660. And so for all of these reasons, there is sufficient evidence of money laundering in this case. In turning, Your Honors, to the restitution and loss amount, it may make more sense to start with the loss amount. Here, the loss amount under the statute only needs to be a reasonable estimate of the loss based on the available information. This court has set that on the BESOM case. Particularly in regards to federal health care fraud cases such as this, the fraudulent bill submitted by government in the health care fraud program constitutes prima facie evidence of the amount of the intended loss, and it's sufficient to establish the amount of the intended loss, if not rebutted. So that's what we're dealing with in this case. The court here found twofold reasons for saying that $80.6 million was the proper amount of loss, and then ultimately the proper amount of restitution. First of all, the court found that since Global unlawfully became a Medicaid provider in the first place, all the money it received through that Medicaid provider agreement was therefore fraudulent. And then on top of that... But the district court recognized there was some work done, right? The court recognized that there was... So it's got to be less than $80 million, right? There was some work done. Well, the question is whether or not that was legitimate, and the way the court framed it in the district court, the court said that it found that... I'm sorry, whether what was legitimate. I thought we agreed there was some work done. Some work done, but my point is that legitimate versus some work was done are two different things. The court found that there was some services rendered here. The question is whether they would be considered legitimate is another question, given that the Medicaid was... No, the lady got our medication. I'm sorry, Your Honor, I didn't hear. I'm just trying to... The court recognized that they're less legitimate. That's why she gave those downward departures. That was in giving the downward departure, not in figuring the loss out. No, but there she acknowledged that there had been... That is one of the reasons she gave for giving the downward departure, is that she says we acknowledge there was some. Aren't I right about that? That there was legitimate business. She acknowledged it. The court said that there were some services provided, but what the court also found in regard to the loss amount itself was that it was impossible to determine what, if any, services were legitimate. Those are the court's words. I agree with that, but that's different from you saying she never found there were some legitimate services. You're totally right. She said, I can't, the government, I can't distinguish between them, but there were some. That's what she acknowledged. I think my point is, Your Honor, I'm not saying that the court did not acknowledge that some patients did get care from AIDS and so forth. That is correct based on the trial evidence. My point is whether or not you would consider those legitimate in a manner that you should take away from the loss amount is a different question. I interjected and I mentioned that that is part of the question because courts have made this distinction. All right, Swan had no right to get the agreement. All right, great. But having received this fraudulent agreement, she provided services to some people and the government's own witnesses acknowledged that and the district court acknowledged it. So what effort was made by the government to quantify those services? It was frankly impossible for the government to quantify those services. Why? Because you had employees who testified as to what they did. You had clients who testified as to the services they received. So even if it's a low dollar amount, not anywhere near $80 million, doesn't that amount have to be taken into account at least in the restitution? The problem is that there's no way to quantify that and the court would allow me to explain. What happened here is the government received all the documentation and search warrants and so forth and the fraud was so rife, as the district court explained, that the scope of the fraud spilled over into documentation potentially for every global patient and employee. Here's what I'm getting at. I understand that can be an argument, but at least one circuit has rejected it. And the point is it's easier for the government if it has records and it can just add up the numbers. It doesn't have records here, but it has human beings. And they testified and the doctors could testify as to what their prescriptions were. The nurses could testify as to what programs they approved. The patients could say, I received my pills every other day. It's laborious, all right? But that may be the nature of the beast is what I'm trying to get you to address. And the problem that makes this case different, Your Honor, is a situation where the aides were going to some patients and saying, here, sign this timesheet and I'll pay you a couple of hundred dollars and we can pretend I was here. In other words, what I'm getting at is sometimes the government's burden is difficult to meet,  and it's not as though the records had been destroyed in fire, that all the clients were dead, that all the doctors who issued prescriptions had no records. I'm just trying to get an understanding of what we're dealing with. I mean, the government's burden may be very, very, very, very, very, very difficult, but that doesn't necessarily mean it's impossible 100 percent, does it? It doesn't mean it's necessarily impossible, but the loss amount, of course, has to be a reasonable estimate based on the available information. The problem here is the available information is when you open the patient files, there's forged plans of care. I'm with you on that. I'm trying to get beyond that. You have the doctors who wrote the prescriptions. Well, there are no doctors writing prescriptions. There were, according to this program. There were prescriptions. There were programs. The programs were approved. And who is it who did those audits, wrote reports about deficiencies, et cetera? That was HRLA. That's the licensure board from the District of Columbia. They went in and they found vast amounts of problems in the records, and at the same time as the surveyors were in one room, Mr. Bikundi and, in other instances, Mrs. Bikundi, are in another room overseeing employees as they're doctoring the files that HRLA is asking for. So following up on a point Judge Taylor's question made, I won't attribute this to him, but if the burden of production then would shift to the defendant where the government says, for all the reasons you've just recounted, it's impossible for us to figure out the amount of legitimate services, legitimate in quotes here, then it's a burden, not a burden of proof, but a burden shift, at least to production, for the defendant to say, in fact, we offered the following services to these patients. And there was some proffer made by the defendant. It's not comprehensive, as I understand it, but there was some proffer, wasn't there? I'm sorry, I'm not understanding what you mean by proffer, Your Honor. Proffer that they provided legitimate services to some of their clients. At the time of sentencing, all they said was something like that. There's some legitimate services. There was never any attempt to quantify. And, of course, even when the burden of production shifts, as the open court said in the Third Circuit, the IU Walla case in the First Circuit said, it's up to the defense when that production burden shifts for the defense to come up with some evidence. And they did not do that here. They just said, we can't give you a loss amount number. There's no loss amount number that applies at all in this case. So they didn't need even a burden of production. And where in the statute does it authorize the shifting of any burden away from the government to the defendant? It's the government's burden here to show actual provable loss. And if the government can't carry that burden, it loses. Where is the authority in the statute to shift that burden somehow to the defendant? I know a couple of courts have done that. I'm asking you where. The authority that we're relying on is the application of 3F8 for fraud in federal health care insurance cases, where the government is putting forth the fraudulent bill submitted is the prima facie evidence of the amount of the intended loss, which is sufficient evidence to establish. That's loss under sentencing, right? Isn't that a different inquiry than the rest of it? Well, that's what we're talking about now, I thought. I was thinking about the restitution. Oh, I'm sorry, and I'm happy to go on to restitution on it. That may be my concern. But the loss amount is calculated. We're relying on application 3F8 of the sentencing guidelines to be 1.1. In regard to restitution, again, we're on a plain error review on this restitution argument because the methodology was not questioned in the district court. Ms. McKenzie just said in a one-liner in her sentencing filings that we object to the restitution and for it for sure that it's being proffered by the government, and Mr. McKenzie said nothing. So what we're doing in restitution is we're following the statutes 18-3664 and 3663A. Well, let me just ask you, so I'm clear about this, which is a defendant objects, all right? So that raises the issue, was the restitution properly, was it correct? Was it proper? It was correct under the law, Your Honor, because as the statute says, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court, and that's 366. You see the problem here? I'm trying to understand this. Once you prove health care fraud, and if it's fraud that goes through the alteration of records, then you just show the dollar amount received and the government sits down. Well, the dollar amount received here by Global was, again, all fraudulent because it was provided by D.C. Medicaid under a fraudulent provider. If we have that legal analysis, moving beyond that legal analysis. Moving beyond that, what we have is a case where the documentation at Global's offices was so rife with fraud that it's impossible to figure out how you can reduce any amount of either restitution or loss by some sort of, quote, legitimate services provided. The fair case said, actually, in certain cases, such as when the defendant is in a much better position than the government to ascertain particular facts, it issues partial shifting of the burdens to the defendants as appropriate. I know, and I read that to be burden of production, not trying to amend the statute to say, now the defendant has the burden of proof. Well, sure, sure. But even here, if you look at it as a burden of production... No, I get your point. They didn't meet their burden of production, but that's what I understood us to be saying. Maybe I'm wrong about this, but I didn't understand the burden of proof itself was shifting. No, I understood it as a burden of production as well, and we're not saying that the government doesn't have the burden of proof. We have it through a preponderance of the evidence standard at sentencing, however, and given the full amount of the billings that D.C. Medicaid paid to Global, it is a valid measure of that victim's losses in this case. Particularly, I would cite the court to the Malott case from the Tenth Circuit, where there was a defendant who made false statements on an application for agricultural subsidies in the court. In that situation, ordered restitution in the full amount of subsidies that the defendant received because he was ineligible to receive any subsidies due to the fraud in his application. Well, what could he proffer? I'm sorry, your honor? What could the receiver of the subsidy proffer? I don't believe he could proffer it. No, but that's a different situation. I don't know what he could proffer. He got the subsidy, all right, and he grew corn or whatever, mines mineral. But here, you have the situation where, you know, it's just like a major corporation. It's operating perfectly, but it's got this one fraudulent unit. And again, it has to be the victim's loss by a preponderance of the evidence, and given the right fraud that was going on at Global, it's impossible for anybody to say what allegedly legitimate service was provided and how that loss did not incur. Oh, let me understand. Your reading of the statute in the application notes would be... And I'm sorry, if I can launch, your honor, a restitution at this point. I'm happy to talk about either, actually. But I want to understand what the government's understanding of its burden of proof is. And I'm at sentencing. And the government, let's assume, has already proven beyond a reasonable doubt that the defendants are guilty of health care fraud. So at sentencing, the government can show the loss amount is the $80 million. As to restitution, is it able to rely on that as well, given the conviction of health care fraud? I believe we are, your honor. We are allowed to rely on that. That can't be the law, though. We're trying to stretch you on that. Because if that's the end of it, then there wouldn't be all this language about the district court finding there were some legitimate services rendered. I understand what the district court did here. She got in a situation where the sentencing guidelines were telling her life, 36 years to life. And she said, I'm going to depart. Correct. So she dropped it down to 10 and 7 years, respectively, for each defendant. And so trying to figure out the calculation, et cetera, is pretty impossible. And I just wonder what the principles that would be established by this case would say. In other words, any time the district court departs downward, then the government is relieved of any burden beyond the prima facie case, even though the government's own witnesses testified that they did receive health care services. No, your honor. We're not arguing that the fact of the downward departure relieves the government's burden to show loss amounts as a reasonable estimate of the loss based on the available information. Well, I hear you. That's sort of where you're going, given our questions. We're pressing you. I realize you don't want to give at all. But that's what I'm concerned about in terms of where we end up here. And is it just that at sentencing, the district court did what was required under the sentencing guidelines and then decided to depart. And that's really all we need to look at. I mean, that's all the court really could do in this case, because as the court recognized, it was impossible, really, for anybody to figure out what sort of value might be applied to those not very common occasions based on the trial evidence where it may have been months and actually provided services for somebody. And for that reason, the court took 3E into consideration and said, I'm going to downward depart. But left the loss amount what it was, because that's under 3F8, what the standards applied to the facts showed, and restitution in the full amount because there was fraud in receiving the contract in the first place. And because the government had shown the 8-page chart. I want to ask a quick question about money laundering, the forfeiture for the money laundering. Yes, Your Honor. Okay, 9821. It says that there's a linkage in this statute. Forfeit any property involved in such events where any property is traceable. So the district court made this linkage finding based on the seven substantive counts, but there were thousands of other transactions for which there's no evidence that they're involved in or traceable to. So how can, I mean, other than the seven that the district court linked, found direct or traceable. There's no evidence with respect to the thousands of other transactions. So, I mean, we can't really say that all 80 million was involved in or traceable to money laundering. We can't say that on this record. So, Your Honor's question, since there was a finite number of money laundering transactions, they can't come up with an $80 million number and divide it in half. Well, the district court made findings with respect to seven, but there's thousands of others. There were numerous transactions, and the other point, the count 15 on which the forfeiture was also based on money laundering was money laundering conspiracy. But you can see there's thousands of other transactions for which there's no finding. We can't make the judgment with respect to all 80 million that they are traceable to or that they're involved in or traceable to. We can't say that about the 80 million. I believe we can, Your Honor. Because how? Because, again, all the money that Global received, the 80 million.6, was from their fraudulent contracts. Do you think her basic finding on the substantive counts, that this was all infected by fraud, is enough? Because its language is so different. It is all infected by fraud, Your Honor. But this statute requires a finding that it's involved in or traceable to. So your position is that her global finding that this was just infected by fraud is enough to satisfy 9821? I would say, Your Honor, that given that the same 39 million was imposed for the 982 offense and under 982A1, that it's a concurrent amount. Even if there isn't a full, if the court is finding that the insufficient information is in regards to the money laundering, you still have the exact same amount that's imposed for the health care fraud, which would be the 80 million. Thank you. All right, anything further? All right, counsel for Florence? Thank you, Your Honor. If I could just briefly respond to a few of the points that the government made. With respect to the Speedy Trial Act, the government suggested that it's not a magic words test. I just want to make clear we agree with that. We're not asking for a magic words test. I think Rice and Lopez-Tierra Gutierrez help us in both of those respects. Some other approximate language like that used in Rice would be sufficient. As the court said in Lopez-Tierra Gutierrez, nonetheless, we have to take the district court at its word. The government suggested that the district court in those cases did not address the public interest. I don't think that's right. In Rice, it did it in the sort of approximate way that I mentioned. In Lopez-Tierra Gutierrez, it did it explicitly. It explicitly referred to the public interest. We talked with the government about the superseding indictment. I think an indictment resets an expired clock. And the reason for that is once the clock expires, as the government said, the indictment is to be dismissed, and the district court must decide whether that dismissal is with or without prejudice. And there are standards for doing that that are set out in the statute. The government prevents the district court from making that assessment if its superseding indictment resets the clock. The district court, had the statute been applied, absent the superseding indictment could have decided to dismiss with prejudice. The government superseding indictment resets the clock. That takes that power away from the district court, though it is given to the court by the statute. With respect to whether the prejudice on the constitutional issue, most of the points that I discussed here previously were discussed in the briefs. As I said, the government itself is the one that talked about the time it took to handle what it received from its subpoena, its bank subpoenas issued on the date of the arrest. That's on page 22 of its brief. We did talk in our brief about the fact that the defendant was incarcerated. All of the cases that talk about the speedy trial talk about the inherent difficulty that that places on the defendant to confer with counsel in any case. And, of course, we talked a great deal in our brief about Government Exhibit 439 and the prejudice that the defendant suffered by its late creation and late disclosures. With respect to the question of whether there was this fraud, other fraud within the global accounts, the defendants did raise that point repeatedly at the trial, so much so that the government responded to it in its questioning of the witnesses and in its closing arguments. So that point that there was fraud in the underlying accounts was definitely raised at trial. There was talk about bounced checks. There was talk about a fraudulent check. And there was talk more generally about fraud. The government said a couple of times that the district court is entitled to estimate loss. The loss number for sentencing guidelines can be an estimate of the loss. The number we're talking about here, $80 million, is very explicitly not an estimate of the loss. The district court said it could not figure out the amount of any actual loss, and it just took the full number of the amount that was paid by D.C. Medicaid. That's not an estimate in any way. With respect to restitution, the government suggested that this is a plain error on appeal. We don't agree with that. The government, in its restitution briefing, said, with no further explanation, the restitution number should be $80 million. The defendants responded in kind. They objected in exactly the same way. And in any event, we think it is plain error, given the text of the statute in this court's decision, in fair. The government mentioned a Tenth Circuit decision, Malot, M-E-L-O-T, in response to the cases that I talked about earlier, where the acquisition of a contract by fraudulent means doesn't taint the money later paid through that contract. Malot is very different. Malot is a case where a defendant applied repeatedly for agricultural subsidies. That wasn't applying in order to get a contract to provide services later and then get paid for those services. They were discrete applications, direct applications for specific subsidies, which were then paid. That's a fraud carried out in getting those specific payments. It's very different from what we have here and from the cases cited in our briefs. If the Court has nothing further, I'll rest.  All right. May it please the Court, Stephen Kirsch on behalf of Michael Bucunde. I first want to make a preliminary remark in response to a comment made by Ms. Kelly. Before the trial even began, the defendants made an agreement, and this was acknowledged by the Court, that any objection made by one defendant would automatically be adopted by the other defendant. Unless the other defendant specifically said they're not adopting that objection. And this relates to the restitution issue. So all of the objections have been adopted by each defendant. But I do want to start out with the Rule 16 issue. We were three weeks into a complex trial, and this was a trial that involved literally hundreds of thousands of documents. We were one witness away from the government's last witness, when all of a sudden this incredibly prejudicial report, Exhibit 439, was dropped on us. So we had to make very quick decisions as to how we were going to deal with it and what we were going to do with this report. The trial court acknowledged that there was a problem with the timing of the report. The trial court also acknowledged that something had to be done to cure the delay, and Judge Howe specifically said, this is not great timing. Well, it wasn't just a question of great timing, it was a question of the prejudice, the severe prejudice that Michael DeConde suffered as a result of this report. Well, let me ask you about that. Now, the district court said all that you just mentioned, and then she said, I'll give you 24 hours. Who objected? Excuse me? Who objected? Well, it's... In other words, where did the defense argue, as you're arguing today, that we need a lot more time, we need to do this investigation, this hits us at the last moment, all that sort of thing? Well, we did make that objection, and I specifically did not accept the court's invitation for a 24-hour recess to further investigate this matter. Donald Schirra, who was the witness that this exhibit was introduced to, who testified about this exhibit, he knew nothing about the underlying data. Interviewing Donald Schirra was of absolutely no use. Counsel for Ms. DeConde actually did interview Mr. Schirra, and I was present during that interview, but I specifically stayed away from asking any questions because I wanted to make the point on the record there was absolutely no point in interviewing this man because... Are you talking about the district court said, okay, we're going to postpone this for today, and you can talk to the witness in the next 24 hours, right? Yes. Is that what you're talking about? Yes. I was under the impression that defense... You tried this case, right? Yes. I was under the impression that you said that wasn't necessary. You actually didn't meet with him that night? Well, I met in the same room with him, but I didn't talk to him. I didn't ask him any questions. Ms. DeConde's counsel did the questioning. Oh. But all of the... And they also gave you a copy of the... an unredacted version of it with all the names, right? Yes, that's correct. But...  I'm sorry. Again, the report was useless. Donald Shiller was useless in terms of addressing the report because he had no understanding, no information about the underlying data. Did you ever ask for the underlying data? Did you ever ask for the underlying data? Doesn't Rule 16 require that? Well, we asked for it, and it wasn't produced. All we got was... When did you ask for that? I'm not sure. Maybe we didn't make a specific request. Did you do the cross-examination with him? Excuse me? Did you do the cross with him? Yes. You did a really good job because, you know, you got him to admit all of that. On cross, he admitted. He admitted that he didn't know how many of these people had been interviewed at all, right? Right. To determine whether they were placed in service. Right. And you got him to concede that he didn't know any of the reasons why any of them stopped. I mean, it looks to me like you totally neutralized this. And then, in your... And then you did the closing before the jury, right? Yes. You did a really good job there, too, right? You said, you told the jury that the government was overusing it, that they hadn't interviewed any of the best judiciaries, right? It was hardly... Why isn't that sufficient to say, well... Yeah, even if there was a Rule 16 violation, you took care of it. The jury couldn't possibly have relied on this document. Let me first respond to a question from Judge Griffith. There was no underlined data. There was what? There was no underlined data. Judge Patel, he said he was responding to Judge Griffith. Oh, I'm sorry. Just preliminarily. I'm sorry. I misunderstood. There was no underlined data. Judge Gallagher just took raw data and took 567 patients and said, well, they're no longer receiving Medicaid. But he had no idea at all about why they weren't receiving Medicaid. And in response to your question, Judge Patel, the reason why Michael Bucondi was so severely prejudiced is that we were deprived of the opportunity, and this is addressed in the United States v. Marshall, to go out and try to interview these witnesses because we were deprived of the ability to go out and maybe bring in a witness who said, well, I'm no longer on Medicaid because my income is too high. So did you tell that to the district court judge? Yes, very specifically. Have you needed time to interview? I am very clear that I made a very strenuous objection to the district court and that I believe that a continuance was not appropriate in the context of this particular trial and that what we needed to do, which would take a very lengthy period of time, is to get out and interview these witnesses. And I would also add to the court that prior to trial, I went out personally with my investigator knocking on doors trying to locate beneficiaries. So this is not something that was some fantasy. This is part of what we did, but we had no idea that this issue was going to arise during the course of the trial. And this issue being what? I'm sorry? What do you mean when you say this issue, quote-unquote? The issue of whether or not the court provided an appropriate rule 16 sanction. No, no, no. But the issue was, had your client provided services that he was receiving this Medicaid money for? No. That issue was on the books, wasn't it? Well, the issue was whether or not of these 567 patients, maybe a certain percentage of them dropped out of Medicaid for reasons other than global being shut down. And Mr. Scherer acknowledged that there's a litany of reasons why they could have dropped out of the Medicaid program. So we were able to elicit that across, but we weren't able to put on affirmative evidence of individuals who had dropped out of Medicaid for legitimate purposes. That's where the prejudice arose. Let me go back to what happened in that 24 hours where the district court said, okay, we're going to postpone this. You can talk to him, and here's an unredacted list, unredacted chart, right? So did you ever say when you looked at that, well, Judge, we need more time to go interview these people? I'm confident that that's the representations that were made because we said that. Can you show me? I'll just ask you a second question also together. And your clients were sitting right there, right? Yes. And you could have showed them the list and said, look, do you recognize any of these names? I mean, were any of these legitimate? Can you tell me that? Were these legitimate patients? And then you could have said to the judge, look, my clients look at this and say, a whole bunch of these people are legitimate. We need time to go interview these people. But she didn't do anything. There's two answers to that question. Remember when Michael Buconde, the record's clear, had nothing to do with patients. He never spoke to patients. He never interviewed patients. But Florence did. Well, but I can't account for what Florence knew. But Michael Buconde did not. That was not his role in this whole endeavor. But then the other answer to the question from Your Honor is that would be burden shifting for us then to have to take this information and go out and introduce these witnesses. Like, for instance, I interviewed a number of witnesses pretrial who I got valuable information from, but I didn't call them as witnesses. I used the information I was able to obtain from them for cross-examination. So sitting with Michael Buconde and going through this list would have been a useless endeavor because he didn't know who they were. He couldn't identify a single beneficiary in the program. That wasn't his role. And again, I go back to Marshall because Marshall involved two jail visitations that the government produced during trial. And in Marshall, the court gave a four-day recess. It was two weekend days and then a holiday came up. And in Marshall, I said, OK, well, they had an opportunity to clean this up. This violation was far more egregious than what we have in Marshall. And a two-day, a four-day, a two-week, a two-month continuance would not have satisfied our need to be able to confront the information that was contained in this exhibit. So the district court said, I'll give you time to interview the government's witness. And then Judge Tatel was exploring with you that effectively you've demolished the value of the report since the witness knew nothing. So then where is the prejudice? The prejudice is still that we could not bring on, at least interview, and then make a determination as to whether or not to introduce actual people to the jury who would get on the stand hypothetically because we didn't have the opportunity to investigate, but get on the witness stand and say, no, I dropped out of Medicaid for a legitimate reason. And had we had the opportunity to do that, we would have done that. Because it would have rebutted the government's case in an even stronger manner. And the other part I emphasize, and sort of subjective, but the government had this long list of witnesses. They brought on witness after witness after witness. We certainly would have preferred, in our case, in Michael Bicondi's case, to put on witnesses to the contrary. So we clearly, that's where the prejudice lies, in that the inability to investigate and the inability to confront in a complete fashion the government's evidence. So as you know, the district court has considerable discretion in the remedy, assuming a Rule 16 violation. So was there a report back to the district court judge after the interview? I mean, did the judge know what had been uncovered in the interview? Mr. Martin and the trial counsel may have said something to the judge, but I have not. It's not on the record. It's not on the record. Well, it would have been ex parte. And it's not something that I would have been involved with because I tried to make the record as clear as can be that I'm not accepting any remedy as appropriate short of a mistrial. And the other point I would emphasize is the court. Well, the district court decides she's not going to grant a mistrial. So then what? Well, then the only alternative would be a seven, eight, nine month continuance. Yeah, that's what I thought. And that wouldn't have been acceptable either. And the reason that wouldn't have been acceptable is we were 95% done with the government's case. We were through all their major witnesses. But you didn't ask for that, did you? No. You objected to it coming in. Yes. You objected to the 24 hour. Yes. But you didn't ask for anything beyond that. I don't believe I did ask for a mistrial. But here's the problem. No, and I didn't say for a mistrial. You didn't ask for a longer time. No, I definitely did not ask for a longer time. But it would have been impractical. And other than the impracticality of it, the fact is that at the end of the government's case, the defense lawyer is going to sit back and say, and we were 95% through, you're going to assess how you believe you discredited the government's case. Did you believe that you adequately demonstrated a bias? You adequately demonstrated some sort of motivation for their testimonies? Because that's what we had with the government's witnesses is to attack their credibility. And at that point in time, we felt that we had done a very good job of attacking their credibility. So we did not want, I did not want, on behalf of Mr. DeConde, this lengthy continuance, because the effectiveness of your cross-examination is going to be diminished over time. We wanted to keep going, keep taking it to the jury. And that's why a lengthy continuance, which would have been out of necessity, was not appropriate in this case. All right. I'm going to move on to the health care fraud. I realize I'm over my time. Yes, but we've been exploring this. There are certain facts that are not in dispute with respect to Michael DeConde. And again, this relates to the severance motion, but he stood in a very, very different posture than Florence DeConde did. The record is clear that Michael DeConde did not sign the Medicaid provider agreement in 2009. And that's a critical piece of evidence, because that's what gets the ball rolling. That's how this started, with that Medicaid provider agreement. And it was Florence DeConde who signed it. It was James Ambide who signed it. And it was another government witness. I believe it was Carlos Iguachon. I may be mistaken on that. But what I'm not mistaken about is that Michael DeConde did not sign this agreement. In that agreement, there's forgeries. There's forged names in that agreement. That was attributed to Florence DeConde. All right, but let's go beyond that. Let's go to the evidence that there was against your client that the government offered. There was. And I would submit to the court that there's a balancing that should be done here. And we outline this in the brief in great detail. But we must do the evidence most favorably to the government. Right. Even with that standard, there were so many inconsistencies with the government witnesses. They were so biased. Every one of them had a motive to come and testify. Almost every one of them had admitted to fraud. Almost everyone had admitted to committing crimes. Almost everyone admitted to being deeply involved in this whole conspiracy. And so, for instance, if you have Nicola White, on the one hand, saying that Michael DeConde was being involved in things, you also have Nicola White saying that Michael DeConde specifically told her, don't submit fraudulent timesheets. So all of these witnesses were really all over the place. And so I would submit to the court that they do not deserve the benefit of the doubt in this case. And that the court should look at the totality of the circumstances and refer that Michael DeConde, because he was not involved at the critical time, that's the inception of the corporation, or the inception of the Medicaid provider agreement. He was simply a guy who was working in that office who happened to be married to Florence Baconde. Who could have quit. Well, he could have quit. What about all the evidence that he was involved in the faking and destroying of documents during the audits? He directed this employee to erase these expired CPR things. He told someone to shred Florence's personnel file. I mean, there's a lot of evidence. You're right, he wasn't involved at the beginning, but there's a lot of evidence he was involved in the fraud. And that testimony came from someone that I would submit to the court was so totally biased that that person was not deserving of the benefit of the doubt, of the reasonableness and the accuracy of the testimony. And the record is the record. And these people came in and said what they were going to say. They were cross-examined, they were challenged, and there were just tremendous inconsistencies that are all outlined in the brief. And again, it's a judgment call, obviously, as to whether or not that type of testimony, those types of testimonies, adds up to adequate proof, or are they so biased that they are not to be believed. That's really hard for an appellate court. Excuse me? That's really a tough call. It is a tough call. I mean, the jury listened to it and accepted it. You know, that's a really, really tough thing for an appellate court to do. I understand that. And we tried to be as specific as possible. No, you did. You were very specific in your brief. It was very helpful. But as you acknowledged, this is like among the toughest decisions an appellate court has to make in a criminal case. And then, last I'll get to the seventh, based upon the disparity in the evidence. And I would submit to the court that this case, this investigation, when it was born, the target was Florence McCondick. She was the person that the government was looking at. And we know that because... Bless you. Ms. McCondick was arrested ten months before Michael McCondick and anybody else was. So you had a ten-month period of time where they had her. They had all of these documents, these hundreds of thousands of documents, that they seized during the search. So had they wanted to go after Michael McCondick during this ten-month period, they could have. But they didn't. So ten months after Florence McCondick is arrested, Michael McCondick is brought into the case. And where the exclusion counts against Florence McCondick, I would submit to the court, were the foundation of the indictment and the foundation of the government's trial. And Michael McCondick had absolutely nothing to do with the exclusion. And that's not disputed. Everybody agreed that that was not Michael McCondick's problem. He wasn't charged with that. But yet, by virtue of his being married to Florence McCondick, obviously they're connected to each other. And Michael McCondick never met with any of the patients. He just was not involved with them. That was not what he was doing. All right. Frequently not in the office. Anything further? No, I would submit and just reserve two minutes for rebuttal. All right. Thank you. Let us hear from the government. Thank you again, Your Honor. Catherine Kelly on behalf of the United States. In regard to Government Exhibit 439, it's important to remember that the district court here, both at trial and then again in its post-trial ruling, found that there had been no violation of Rule 16 in the first place. So we don't even get to the point of whether or not the sanction here was appropriate. What was the basis for that ruling? The basis for that ruling was the fact that the government did not have Government Exhibit 439 or the data underlying it in its possession. Yeah, but it told Mr. Shearer to get it together. It asked Mr. Shearer in the months before trial to see if he could figure out a way to try and quantify the other data. The government could have said, we need this by 30 days from now. You could have asked him to do it earlier. The government could have asked to do it earlier, but that's not what Rule 16 looks at. This is classic. What Rule 16 is trying to prevent. Major reports coming in at the end of the trial. Well, first of all, we would not say that this is a major report. That's the counsel's argument. If you didn't think it was major, maybe you wouldn't have risked putting it in. The point is, Your Honor, in Rule 16, it contemplates that investigation can still continue during trial because it's a marshal case. And that's exactly what was going on here. So was the defense counsel alerted to the fact this report was coming? No, it was not alerted. But again, Rule 16 doesn't require that either. I understand all that. But you see the problem. Suppose we just record a granted mistrial. Government has to start all over again. That's correct. If no one has government's interest, we would have this situation unless it's just a strategy. It was not a strategy in this case. Well, you sit here long enough and you begin to wonder. I mean, it's obvious what the government was trying to do. And isn't this important evidence to the government? Since you had all these witnesses who had their own motivations for testifying as they did. Mr. Shearer was not a member of the prosecution team. His testimony at trial was that he met one... He was preparing this report at the prosecution's instruction. Is that correct? He gathered evidence... That's a yes or no. It's actually not a yes or no because... The government did not tell him to generate the report? No, it did not. So he did it on his own to respond to it? The government asked him to see if he could figure out a way to quantify the fraud in some manner. He did not say, please generate this particular exhibit. It was Mr. Shearer who came up with a way to do that. He comes back and says, I thought of a way of doing it. Exactly. And the government says, oh, that's interesting. Exactly. And he came back and said, I thought of a way to do it and handed government exhibit... The document that became government exhibit 439 to the government that very day. So you think that he thought the government was just making sort of... What? An aside? See if you can quantify this? They asked him to see if they could quantify it, yes. And that's not asking him to prepare a report that he can quantify it. I just want to be clear. Magic words here? No, it's not magic words, John. But he was asked to see if he could quantify it. What he came up with in doing so was what turned out to be government exhibit 439. And as Mr. Shearer explained during his testimony, it took him a while to figure out how he was going to try and do searches in the D.C. government agency's own computer. Was the district court concerned about perhaps bad faith? No, it wasn't, no. Did it address that issue at all? The court did address the issue, and the court found that there was no bad faith and that there hadn't been any allegations by the defense of bad faith. That's in its post-trial ruling. So there wasn't schemes and shifts. The defendants did not allege schemes and shifts, and the district court found none. That's the way that came out in the post-trial ruling. So even assuming there was a Rule 16 violation, your argument is that the district court acted reasonably here. And the district court did allow a continuance overnight, allowed the defendant's counsel to interview Mr. Shearer. Now, I haven't seen this in the record, but candidly, I haven't looked for it either. But we heard counsel tell us that objections were made on the record to the district court indicating that interviewing Mr. Shearer would be useless and that a mistrial was required. There is no evidence that I have seen in the record that anybody moved for a mistrial. All right. I believe that Mr. Bakundi's attorney said that he didn't think it would be useful to interview Mr. Shearer. No. The way I had read the record on the point generally was the district court set out maybe 24 hours, and nobody asked for more time. No one asked for more time, which seems to be what is now being said was the wrong thing. Doesn't Rule 16 require that the defendant request the basis for the information, basis for the report? The basis for the report? Yeah. There's some obligation on the part of the defendant. If the defendant is going to invoke Rule 16, doesn't it start with the defendant requesting information, or am I reading that wrong? And there's no request made here, so I understand. I'm not sure the issue as it was presented was them requesting the underlying data. No, but that's what I'm getting at. Doesn't Rule 16 require of a defendant to make such a request? Yeah. The rule is premised, and the language says, upon defendant's request, the government must permit inspection or copying of an item if it's within the government's possession, custody, or control. So there is a request. As Louis Florence Bakundi's attorney pointed out in his Rule 33 post-trial filings, the government, in fact, did offer to provide all the backup data to the defense prior to Mr. Hsu's testimony. So there isn't any question that the government was withholding information in that regard. But I had this question. Judge Tatel has a question.  I was going to pursue Judge Rogers' question. Assume for a minute that we think there is a Rule 16 violation. And we focused a little bit on the fact that, well, we focused a lot on the fact that the district court, the district judge gave defense counsel 24 hours. But Hsu testified that, my question is going to be, how do you, what's your argument in view of this? Okay, Hsu testified that during this month and a half period, these patients on this list received $30 million worth of Medicaid services. And that from March until then, afterwards, they got none. Okay? And then, in the closing, the government says, the government says, this is strong circumstantial evidence. Strong circumstantial evidence. Right? That these people on the list, right, weren't getting legitimate services. And it said the chart, it called the chart, I'm just reading through my notes here, compelling evidence. Right? And then, even in the rebuttal, it emphasized. So the government made a big deal of this, both at the trial and at the closing. Didn't it? The government relied on it in closing in two instances and mentioned it again in rebuttal. Yeah, but it's more than, you call it compelling evidence. It was. The government said it was strong circumstantial evidence. Strong circumstantial evidence, compelling evidence, that these people who got $30 million of Medicaid services and then after the place was closed down got none, that that's strong circumstantial evidence that all that was a fraud. Isn't that very strong evidence? I assume the government must have thought so. The government thought it was good evidence. I'm not refuting that. How do you make the argument that given that, this Rule 16 violation is not? Well, assuming there is a Rule 16 violation at all, which we don't know. No, that's my question. You're sticking with my question. I did. Florence Bukundy's response in closing and the questioning during cross-examination was sufficient to rebut that. But you just said that. How do we write the sentence in an opinion that explains why it is? I know you can assert that. Why it's not a problem? Yeah. It's not a problem because, number one, the defense never sought any additional continuance to investigate. No, no, I'm not asking you about that. I'm asking you about the fact of the testimony before the jury and the government's statements during the closing. The effect on the testimony given the cross-examination in Mr. Scheer put the defense in the exact same position as they were now trying to claim they could have been had they investigated. They, during closing argument, Well, that's a speculation, isn't it? Yeah. Well, it's a speculation because we don't know. But what we did see in trial was the defense counsel on cross-examination making the exact sort of points that they're trying to say in their brief could have been brought up. But you said had they investigated. How do you know what they would have come up with had they been allowed to investigate? It could have been very different. And isn't that the point? It's not the point, Your Honor, because they never sought any additional time to investigate. And it's not a matter of what, hypothetically, if we think about it now, could possibly, which is not in the record, have ever come out of any sort of investigation. The points are that Donald Scheer was questioned during cross-examination, and the points the defense brought out was that there were, Mr. Scheer conceded that he couldn't say how many of the 567 beneficiaries his office had even interviewed. He conceded that a small number of the beneficiaries on that chart had died. He didn't know why any of the beneficiaries listed on that chart no longer received services after Global closed. He agreed that there were other reasons. It seems to me your argument now is flying in the face of the closing argument that was made at trial, that this was really compelling evidence. Now you're saying, well, it really wasn't so much because it was a withering cross-examination by an attorney who didn't have an opportunity to interview the people? No, the point is that to show a Rule 16 violation that affects the convictions, the appellants have to show prejudice to their substantial rights. And what has not been shown here is any prejudice to their substantial rights, given that they never asked to do further investigation, that they got strong cross-examination opportunities that are laid out, and in particular, page 75 of our brief, and then they, you know, despite the government saying that this is compelling circumstantial evidence... You said they had strong cross-examination opportunities but they had no chance to interview the people who were the basis for the report. How can you make a strong... I doubt that you or I would think that that sort of... If that was the cards that we were dealt with, we would think that we had a strong cross-examination opportunity. We had a chance to cross-examine, but it's not a strong one until you can go and talk to the people who were the basis of the 439 exhibit, right? I would not concede that, Your Honor. This is a choice, as... You would go ahead, okay. Hypothetically, as a counsel, if you had an opportunity to interview the people that formed the basis for the 439, and you decided not to do that, you were just going to go in and cross-examine Mr. Shearer without talking to his witnesses, you would do that? That's exactly what Mr. Bicondi told you today and was done in this case. I know it was done, but I'm talking about you. Would you... When I do that, I actually would, given all the evidence that I've seen in this case. I would not. It's a matter of... But again, this is a matter of them trying to show prejudice to their substantial right. And that may be one of those questions that one counsel would do something one way, another counsel would do something another way. What Mr. Bicondi's attorney has said here today is that they chose to go ahead and not take that route. They didn't want this information to become stale in the jury's mind. They didn't want a lengthy continuance. They wanted to get this to the jury as quickly as possible. And my point is that in closing, the defense made good use of the fact that Mr. Shearer's report... It's all argument, though. Extremely thin evidence, as thin evidence of fraud as they had seen, was the quote from Florence Bicondi's attorney. Right. Okay. Are you finished on your response? I am, if the court has no further questions. I have a question. Mr. Shearer came up with this list of 437 people who had received or not received service. Is that correct? It was 567 people who, from some period in 2012 through 2014, had... Payments had been made for those beneficiaries to Global during that time. And then, after Global closed, in the time period following that, I believe it was for the rest of 2014, no other agency billed D.C. Medicaid for services related to those beneficiaries. So, presumably, Defense Counsel Cross was strong, subject to Judge Griffith's observations, in the sense that Mr. Shearer was unable to say if any of these people had been interviewed. That's correct. And that question about the interviews was that Mr. Shearer was testifying that Global and several other health care agencies were closed the same day, and they were left with approximately 3,200 Medicaid beneficiaries that weren't going to be receiving services. So, his agency, a D.C. agency, was trying to contact as many beneficiaries as possible to see if they wanted services and needed help getting services from another agency. So, I'm back to restitution. There was a list of clients who could have been interviewed to figure out whether they received any services or not. There were clients that were listed that could be interviewed, but the question is then whether or not those services that had been provided were, in fact, legitimate services. Was there fraud in their files? No, but they are a legitimate qualification. Did they receive services? Some of them received services, but as one of the... And they received from D.C. Medicaid $30 million. The beneficiaries did not receive money from the Global... No, no, I don't mean the beneficiaries. I mean the defendants received $30 million. Correct, for some period of time. My point is it's not impossible to figure out. No, it is, Your Honor, because here's the difference. Mrs. Jones says I was there for two years and I got my pills every other day. Ms. Jones may have had an aide in her house that had fraudulent certifications that she had the education to provide the services. I know, because you have the qualifications, I know. That's all important. That's part of the Medicaid agreement that you make is that you're following the rules and regulations of Medicaid, like having providers go to people's homes. I know, but you don't want to argue a perfect system. I'm just trying to argue restitution. And I'm not even trying to argue it, but I'm trying to understand what's available to the government. Where are we to send this back? Well, in particular... And, of course, counsel for appellants says, the district court has already made this finding, so we can send it back. But if we disagree with that... I would disagree with that heavily because they're relying on the fair case. I'm sorry, Your Honor? You would disagree with what? I would disagree that if the court is unhappy with the restitution amount, that it could not be remanded at this point. They're relying on the fair case to say that. I don't think the question is our happiness or not, just so we're clear about that. But all I'm trying to understand is, would the witnesses who testified as government witnesses plus the records that D.C. Medicaid had, there is a possibility of tracing whether or not services were provided. Did Mrs. Jones get her medication every other day? Did she get a bath every other day? That sort of thing. So it is not necessarily a situation that it is impossible for the government to meet its burden. That's what I'm trying to understand about that. I understand, Your Honor, and I understand your point. But the case that I would ask the court to look at is the Jones case. I believe that was the Fifth Circuit, and they were talking about if you send somebody who is not qualified, I think that case was physical rehab aides, if you have somebody who is not qualified to provide that service, then Medicaid hasn't received something of value from that aide going to the house. And it's the same thing here. You have many, many instances where the qualifications of the aides were doctored in the employee file. You have numerous situations where plans of care under which the global company was supposed to provide services because they had been signed off on by a doctor saying this person needs services and here are the services that Medicaid should cover for this person. All of those had false dates and signatures where doctors maybe signed a plan once, but then they were supposed to renew them every 30 days or so, and they would just stick a new date on their files and forge doctor signatures and put cut-and-paste jobs together. So those are the reasons why there's so much fraud inherent in global files that even if you could interview somebody who said, yes, this lovely lady came to my house and gave me my medication and gave me my lunch every day, it is still not clear that Medicaid should have ever paid for those services if they were done by unqualified people under falsified plans of care. And that's the point we're making. Thank you. Anything further? Unless the court has any further questions, we would rely on the vast evidence that we've placed on the record in our brief as the sufficiency, and for those same reasons, there is no disparity of evidence that would support severance in this case either for Mr. Bikundi. Thank you. Thank you, Your Honor. All right. Counsel for Michael Bikundi. Just briefly, I did not ask for a mistrial, and I want to make that clear. And the reason I didn't ask for a mistrial is I specifically recall that when this issue arose, how I can make the best record in the context of the trial, in the context of what I consider to be a very significant Rule 16 violation. And I made the decision that it was not appropriate or the best record for me to ask for a mistrial, but I did very strongly object to the admission of this testimony and the admission of this report. And I specifically recall using the term ambushed and talking about that with Judge Howell. That's exactly how we felt, that we were ambushed by this document that was in preparation for at least a month before trial. So in terms of the chronology and the objections that were made, that was my objection on behalf of Mr. Bikundi, that this testimony should not be received by the court. And further, with respect to Mr. Shearer, he specifically testified that the government, the United States Attorney's Office, asked him, and Ms. Kelly talked about this, to quantify the fraud. He was given a specific task, he was working at the behest of the government, of the United States Attorney's Office, and it was the United States Attorney's Office that was trying this case and that admitted this evidence. So for all those reasons and every other reasons, we ask this court to report the release. All right, thank you. Anything further? We will take the case under review. Ah, I beg your pardon. We want to thank counsel for both appellants for the fine service they have rendered to the court in this complicated case. Thank you.
judges: Rogers, Tatel, Griffith